Good morning, Your Honors, and may it please the Court, David Wilson for Appellant Kevin Simmons. As a preliminary matter, I'll be addressing the excessive force issue, and my co-counsel will address deliberate indifference to medical needs. The District Court erred in granting summary judgment because it failed to consider the case in the light most favorable to Mr. Simmons. Given the circumstances which immediately preceded Arnett's use of the 40mm launcher against Mr. Simmons, it's clear to the Regents that... But both claims are as an Eighth Amendment violation, right? That's correct. But it's not a Fourth Amendment violation, it's Eighth Amendment, so you still have a component of deliberate indifference in yours as well, don't you? Yes, Your Honor. Okay. I just wondered, are you going to handle that relative to the, I think, the three sledge shots? Yes, that's how I'd go. I'm sorry, go ahead. Given the circumstances which immediately preceded Arnett's use of force, it's clear that a reasonable jury could find that Arnett had actual knowledge that Mr. Simmons was, at all times during this attack, the defenseless victim. And while Arnett acknowledges that it never makes sense to shoot the victim of an attack, that's exactly what he did. All right, well, okay, but we're in a prison, okay, which is a little bit different than anyone that's visited a prison. I don't know if you ever have, but I have, not as an inmate, but I've been there. Basically, the way that they work, and there's a watchtower, and people, they're out in the yard, right, where everyone's mingling. And the sirens go on, and every inmate in that prison knows when the sirens go on, what are they supposed to do? Get down. Get down. Because there's someone up in the watchtower that can shoot them with real bullets, sponge bullets, or whatever. So, here, it's undisputed that the, I guess, that the officer did not go to the real bullets, correct? Correct. Used three sponge bullets. Correct. And also, used them, is it, used them as he was directed to use them below the waist and not in the groin, correct? Yes, that's correct. Okay. So, and it's undisputed, I believe, that your client did not hit the ground after the air raid. That's correct, Your Honor. Because your client and the other individual were still kind of facing each other, and they were not on the ground like they both should have been. So, I guess on those undisputed facts, if everyone knows that those are the rules, why did the, why was he deliberately indifferent hitting him with three sponge bullets to stop the action? Yes, Your Honor. So, what's critical to understand in this case is that this was not a fight. This was not mutual combat. This was an attack and a one-sided assault from another inmate. So, Arnett had actually... But how in the heck can that ever be ascertained from up in the tower when the whole function of, and everyone in the prison knows this, when you're up in the tower, when some kerfuffle of whatever it is happens, the reason you put the air raid on is everyone get down so that whatever's going on can be ascertained at a later point. They didn't do that. Yes, Your Honor, but we can deduce Officer Arnett's mindset here based on what happened before the attack by inmate Murillo. So, what happened before then was Officer Arnett granted a sit-down meeting to inmate Murillo and members of the Two Fibers prison gang. Then immediately after that, he witnessed members of the gang taking turns punching and slapping inmate Murillo to the point where he was bloodied. And then immediately after telling the inmates to stop fighting, he then witnessed inmate Murillo make his way over to Mr. Simmons on the second tier of the prison. And like you mentioned, there is a vantage point this entire time for the prison guard. That's the point. So, they can keep an eye on the entire yard and to make sure that everything is in order. Well, what was he supposed to do? I mean, my understanding of prisons, which I found, that the people that are walking around, the correctional officers that are walking around, don't get to have any guns at all. They don't have the sponge bullets. They don't have anything. I think they have something called feedback or whatever. They can spray people. So, that's why they have people up in the tower. So, if anything's going on, that you immediately stop whatever's going on, and then there's an opportunity to do something. So, what could he have done differently? Your Honor, I think what he should have done differently is exactly what he acknowledged he would have done in his deposition. He mentioned that if you have a clear victim of an attack, which is what we have here, in the light most favorable to Mr. Simmons, he clearly was the victim of this attack for the entire time, that in that situation what he would do would be to sound his siren, to sound the alarm, and to wait the approximate 30 to 45 seconds for the other prison officials to come in and to restrain the inmates. And that's exactly what happened in this case. The officers responded within 30 to 45 seconds. Ten officers, in fact, responded. That's at ER 94. So, especially in light of the fact also. How is that deliberate indifference if you would, in hindsight, do something different? I think there's some case law to that effect. Yeah, but it goes directly to the officer's state of mind here. So, under normal situations, if he had just chosen to use the force that was not, in the second guessing of a judge later on, correct, that's obviously not covered by the Eighth Amendment, excessive force. But here, given what he saw before, given that he was 30 feet away at all times from both inmate Murillo as well as Mr. Simmons, shows that he clearly knew what was going on. He had eyes at all times on both inmates and saw inmate Murillo then make his way over to Mr. Simmons. So, it just doesn't make sense. It doesn't square with his testimony that he perceived a fight. Because, again, this was not a fight. And can I ask a question related somewhat to these questions from Judge Callahan, which is we know from whatever the case was, the Marquis case. Marquis. I'm not sure if I'm saying it correctly. But we know that you can get qualified immunity. I know that you distinguished the case based on distance and such. But we know that you can get qualified immunity. What I'm struggling with is how, if what you're saying is true, how would an officer ever get qualified immunity? Because, I mean, in this case, it really is a bit of a he said, she said, in the sense that you have an inmate that says, I was, you know, the officer says, I saw two people fighting, essentially. The inmate says, I was not fighting. I was the victim. And at the end of the day, you're saying, well, that has to go to a jury. They don't get qualified immunity. But why would that always be the case that you would never get qualified immunity? Because the inmate can always say, well, I was the victim, and the officer asked her, why would that always be the case? And if that would always be the case, then we have a problem because Marquis says that you can't get qualified immunity sometimes in those he said, she said circumstances. Yes, Your Honor. I take your point there. And it's true that, first of all, there is a circuit split as to whether you can be entitled to qualified immunity in addition to being found to have violated the Eighth Amendment with excessive force. But what's different about this case, and what's different about this case from Marquis in particular, is the fact that here there are. Your Honor, let me be clear. It's not that you, I'm not sure I agree with that way of phrasing it. It's not that you're necessarily been found to have violated the Eighth Amendment, but you're qualified, but you get qualified immunity. What you're saying is that in the light most favorable, in a sense of like disagreeing with everything that the correctional officer is saying and agreeing with everything the inmate is saying, then there would be a, then you might be eligible for an Eighth Amendment, you might be eligible, the jury might give you an Eighth Amendment violation. But that's different than saying that you found an Eighth Amendment violation. You know, what we're really trying to struggle with here is, as Justice Collins said, in the present context where you've sort of, you've got these stories and you have strong incentives, perhaps on either side, to tell a certain story. But, again, why, if you can get qualified immunity in that context, then why would this case not be that kind of case? I mean, does it really turn on 30 feet versus, I mean, as I see it, it's mostly your witness, Steven C. Marquez, is 30 feet versus what is it? 200 feet. 200 feet, yeah. Yeah, so, Your Honor, in addition to the discrepancy between the distance in Marquez versus the distance here, what's also relevant is that there was no direct challenge to the officer's state of mind in Marquez, which we have here, and we have evidence to back that up. So I take your point that to a, I'm confused about it because you don't have any evidence. You know, it's not like the officer said something. There's no direct evidence of the officer's state of mind. All you've got is what you're saying the circumstances would seem to indicate about the officer's state of mind, but that's just as true. They may not have said it, but that's just as true as in Marquez. Well, in addition to that, Your Honor, there is a credibility issue between what Officer Arnett mentioned in his deposition, which is that he didn't see either inmate ever actually land a punch on one another. Well, he does testify that they're flailing towards each other. He says that he doesn't save the strike. So it's not like the inconsistency is not as stark as you're saying. It's not, Your Honor, but I would point out that the reason that that matters and the reason why it matters what happened before the attack is that these are classic examples of disputes of material fact that are meant to go to the jury. All Mr. Simmons is asking here is for the jury to hear his case and to evaluate the credibility of Officer Arnett and to evaluate the circumstances in which he used the sponge bullet to get the decision. One last question. I know we're over time. There's a sense in which what we're just talking about, you know, the brief talks about inconsistencies, and you did a great job on that. But in some sense, would you agree that it's not necessarily an inconsistency for the theory that he said, as you said, doesn't even have to be an inconsistency because it could be true that the inmate was, in fact, the victim and was not fighting, and it could also be true that the officer may not have perceived it that way. Both could be true. Is that correct? Absolutely. Both could be true. But, again, in light of what was seen by Officer Arnett before that and in light of the fact that this was at such a close proximity, the fact that Officer Arnett saw another inmate being beaten before. Do you have a case, what would be your best authority? Let's assume that your client is the victim, okay? What would be your best authority that in a prison, even though your client was the victim, but there was a conflict between two people, that this was an Eighth Amendment violation? Do you have a case on that? Yes, Your Honor. For that, I would cite Marquez as well. Really, this case goes back to Marquez. All right. We'll wait over, so let me see if Judge Arterton has any questions. Otherwise, we'll move on. I think I'm going to wait. Okay. All right. Thank you. Thank you. All right. So we'll hear from Mr. Widjaja. Good morning. Good morning, Your Honors. May it please the Court, my name is Jonathan Widjaja, fourth petitioner, and I'll be addressing the Eighth Amendment issue regarding Nurse Lopez's deliberate indifference towards Mr. Simmons' medical needs for six minutes, one of which I'd like to reserve for rebuttal. In this case, Nurse Lopez acted with deliberate indifference towards Mr. Simmons' medical needs when she ignored his statement that he had been shot, failed to examine his body, and falsified his medical record by stating that Mr. Simmons slipped and fell on his head. I remember when he first came in, he said, she asked what happened, he said, no comment. Yes. That's a tough ground to start off. If somebody comes to their medical provider and says, hey, what happened? They say, no comment. It's hard to blame the medical provider after that. He was in front of the medical provider. How long was he with her before he got the other care? About 15 minutes. Which isn't very long. I think your argument is that sometime during that, he changed from no comment to saying something that's. . . He did. Yes. Did he talk about the slip in the water? When did that come out? So, he initially stated no comment, which she wrote down, and then he told her that he had sat in some water, and then in response to that, she wrote that he slipped in water instead. I thought some other officer told her something about water, and that's why she changed it. Yeah, I think the officer also corroborated that. He had sat in some water. I think you portrayed it as somehow nefarious, but if I'm a nurse and I'm trying to figure out, and he says no comment, okay, no comment, and then somebody else comes along and tells you something, I go, okay, so what's the slip in water? It doesn't sound too nefarious to me. Well, sitting in. . . He's talking about the actual, like he'd been shot. Yes. To say no comment. Yes, which he did also end up telling Nurse Lopez that he was shot on his backside, and she did not correct it at that time. Can you tell us how close that was to when. . . Because you only got a 15-minute period here, you got no comment, then you got slipped in the water. I mean, we know how close to when the other medical professionals took over the actual. . . These other details came out. She referred Mr. Simmons to the emergency room about five minutes, and so I think a reasonable inference can be made that this conversation of correcting the record in his form was within the first five minutes. So I understand that you focus on her failure to do the full-body examination, there's a mark on the little chart where she found all the injuries and so forth, but if that was deliberate indifference, how did it exacerbate Mr. Simmons' leg injury, and did it cause a delay of medical significance for his thigh and buttock injuries in this short period of time? Yes, so his leg injury that was broken was treated, but for his thigh and buttock injuries that he stated to Nurse Lopez, those went untreated for three days. But he was long out of her surveillance by that time, so I'm trying to figure out how that went undetected, three days, and that's her responsibility. Yes, and I think that should be decided by a jury, because a causation between Nurse Lopez's failures in treating and Nurse Lopez's failures in screening Mr. Simmons and the subsequent harm to his thigh and buttock injuries are an issue of fact that should be decided. You understand, like, it's a little implausible, right? Like, he's sitting there, and he doesn't tell her. He says, no comment, and then he stops up in the water, and then he says he's shot or something. It's all happened in a short period of time, and then for three days, he said, man, my hip really hurts here, but I was not going to tell any of the other medical professionals. I think that's maybe what Judge Archer was getting at. It's like, why didn't he tell somebody else, like maybe the people that picked him up? He was on their medication search, so I don't – we aren't sure. Well, if that's his explanation why he doesn't tell anyone, but if he doesn't tell anyone, that's what we have to look at. That would be the undisputed fact of if you're talking about deliberate indifference. How can something be deliberate indifference if you keep it in your mind? Because Nurse Lopez. She's supposed to be prescient. Well, she had a duty to screen him properly, and Mr. Simmons had a right to be screened fully. The 1719 form required Nurse Lopez to consult. So when an inmate in prison doesn't want to tell you something, she's got to turn the interrogation light on and say, I'm getting this out of you no matter what. I don't think that's necessary because right here, this is a gunshot wound. These are three gunshot wounds to his leg and his backside, and within 15 minutes. Well, they're sponge. I don't want a sponge shot myself, so I'm not minimizing that. But it's not the same as a gunshot where it's blood flying out of it. It still injured his leg and it broke his leg. He had a bad break. He had that. But he went to the emergency room. Don't they look them all over there? They do, but I think in an emergency room, doctors and nurses triage the different issues. So in an emergency room with a 1719 form being able to formulate the basis for treatment, if it only says leg pain and the doctors saw that, they focused in treating the leg pain and stabilizing the leg immediately, which is what they did. And because there's Lopez, they didn't state the backside injuries. Those injuries went untreated for three days when they were discovered, and they had to tear away the clothes from his wounds. Do we know for the record, I can't remember, did he actually tell that he had been shot in the backside? Yes, so he stated to her after saying no comment, after saying that he sat in water, he did correct her and say that he had been shot on his backside. And she ignored that statement and failed to properly examine his body and then just kept going. And she sent him to the ER, right? That's correct. Okay. All right, your time's up. Thank you. Thank you. All right, we'll hear from the appellee. Good morning, Your Honors. Good morning. May it please the Court, Deputy Attorney General Cassandra Shryock, on behalf of appellees Officer Arnett and Nurse Lopez. Faced with an emergency situation, both Officer Arnett and Nurse Lopez have to make decisions in haste, under pressure, and without the luxury of a second chance. Neither Officer Arnett's decision to fire sponge rounds at inmates he believed to be engaged in a serious fight, nor Nurse Lopez's decision to refer Mr. Simmons for emergency medical care violate the Eighth Amendment. And both officials are entitled to qualified immunity. Therefore, this Court should affirm. I would like to briefly touch on the deliberate indifference claim. Is the burden different? Is it harder for the appellant because it's an Eighth Amendment claim than if it were just a straight excessive force under the Fourth? Yes, Your Honor. Under the Eighth Amendment, the question turns on whether the officer's conduct was in a good faith effort to restore or maintain discipline, or if it was malicious or sadistic for the very purpose of causing harm, where if the claim were under the Fourth Amendment, then the issue would be reasonable then. So the Eighth Amendment is a much higher bar. So is there a triable issue of fact on whether Arnett perceived there to be a real fight between Simmons and Murillo? And if so, how does that factor into the analysis? Your Honor, as the Ninth Circuit explained in Marquez, we must look at the situation from a reasonable officer in Officer Arnett's position. So there is a qualified immunity. But what about the basic question of what did Arnett see and do, and did that violate the Eighth Amendment? And the question becomes if you are, as Mr. Simmons described, a person with your face buried in the belly of your assailant and you have begun to fall to the ground, how could Arnett, Officer Arnett, have thought that Mr. Simmons was also an assailant? I'm taking the facts of Mr. Simmons and asking you to respond, if we take Mr. Simmons's facts, as to whether or not a jury could find that Arnett had violated the Eighth Amendment. That's apart from the qualified immunity issue. Yes, Your Honor. And we have, for purposes of summary judgment and our briefing, for purposes of this appeal, assumed Mr. Simmons's deposition testimony is true. So Officer Arnett being stationed 30 feet away, the only officer in the building, if we assume what Mr. Simmons says is true, he observed Inmate Murillo punch Mr. Simmons in the head. Then Inmate Simmons immediately put his hands up towards his head. And then Inmate Simmons says both he and Inmate Murillo grabbed at each other. I can provide the record of things to Your Honors, if you would like. They grabbed at each other. And then Inmate Simmons wrapped his arms around Inmate Murillo and buried his head in his torso, as Inmate Murillo held onto Inmate Simmons and then would punch him with one hand. So indisputably, there's an ongoing, serious physical altercation. Mr. Simmons is physically engaging with Inmate Murillo throughout the entire incident. And so an officer 30 feet away in the control booth, the only person in the building with only two force options available to them, sees this and would believe that there's a serious physical altercation going on, that he needs to deescalate as quickly as possible. Officer Arnett had two force options. He could use live bullets to stop the spike, or he could use sponge rounds. He chose to use sponge rounds. And he chose to fire sponge rounds at the area he was trained is the least likely to cause serious injury or death. Further, it is undisputed, based on Mr. Simmons' deposition testimony. Counsel, building on Judge Hardison's question, I hear your argument, and I think what you're saying, the way I might try to characterize it succinctly, is that both things could be true. It could be that we don't have to determine that Simmons is an aggressor. Simmons is the officer, or Simmons is the inmate. Simmons is the inmate. So we don't have to determine that Simmons is actually an aggressor in order to believe Arnett's testimony, that he perceived that it was mutual combat. In other words, both things could be true. And I think that makes sense to me. I mean, just because somebody grabs somebody and buries their stomach, that sounds like many UFC fights that I've seen where I think both people are aggressors. And so I think it could be true that both of their testimony, both their perspectives could be true. The problem for you on that is that, as I read Mark Kaz, it's very good for you on qualified immunity, but it's kind of bad for you on the actual issue that you've just been addressing, because it does say essentially there's a triable issue for purposes of an Eighth Amendment violation under facts that I think are fairly similar. So how come Mark Kaz doesn't work against you on the actual Eighth Amendment issue, not the qualified immunity, but the Eighth Amendment issue? Because, Your Honor, Mark Kaz is distinguishable here, and really this case is more akin to Whitley. In Mark Kaz, the plaintiff was testifying, I wasn't doing anything. I was standing separate and apart from this altercation that was going on. There was an inmate on the ground. That inmate was being kicked. I wasn't doing anything. I was standing some, you know, nearby but some distance away. Here, Mr. Simmons admits that he was physically engaged with inmate Murillo every single time a shot was fired. Not a single shot was fired once the fight stopped, once the inmates got on the ground, as they know they are supposed to do when an alarm sounds. So this really is more akin to Whitley v. Albert, and as Your Honor pointed out, both things can be true. Mr. Simmons, as can be accepted for summary judgment and for this appeal, that he did not initiate this fight. Now, what does Whitley stand for? What proposition does it stand for from your perspective? That the conduct that is in a good faith effort to restore order is not malicious and sadistic, and there were several prescient points that the court went through that are similar here. There, the court noted that the inmate's conduct in Whitley, the inmate who was shot, that his conduct was equivocal. The inmate there said that he was actually trying to help officers during a riot, but the officers didn't know that. And the court said the conduct was equivocal, the officers could have believed, they could have plausibly believed that there was a need to use force in that situation, and therefore it was not malicious and sadistic, it was in a good faith effort to restore order. Also, the court noted prison officials have no way of knowing what direction matters could take. And so here, similarly, throughout the fight, we know there was a physical altercation. Both inmates are grabbing onto one another, punches are being thrown, even according to Mr. Simmons, and that poses a significant risk to both of those inmates. An unacceptable risk that Officer Arnett had to deescalate as quickly as possible. And he tempered his use of force. Isn't there significance to the fact that there wasn't anybody else around? There were no inmates, there were no guards, there was nobody else who would be at risk from these two inmates in their confrontation? Does that play, in your mind, a significant role in distinguishing it from these other cases? Not here, Your Honor, because the risk was to inmate Murillo and to inmate Simmons, and other inmates could have, if the fight continued, other inmates could have gotten up and joined in the altercation. As the Supreme Court completely noted, prison officials don't know what is going to happen next. As a prison official, let's say those are the only two. But you don't know who started it, you don't know any of it. But does the prison official have a duty to stop it, like you said, to restore order? Because whoever's at fault can still do more damage. You know, I mean. Yes, Your Honor, certainly. And even if you don't start the fight, that doesn't mean you wouldn't fight back. And someone might not start the fight, and they may actually inflict more damage on the other party than the person who did. One officer Arnett saw, according to Mr. Simmons, was a serious physical altercation where Mr. Simmons testified he feared for his life. And so an officer, 30 feet away, with no one else in the building who can respond, believed he needed to immediately de-escalate the situation. And he did so with the least amount of force that he could use. He aimed at the area that was least likely to cause serious bodily injury and stopped using force as soon as the fight stopped. That does not rise to the level. Now the one person who, if you believe Mr. Simmons' testimony, was not the assailant. Yes, Your Honor. However, from his position, and as Mr. Simmons testified, even if he was not throwing punches, he was engaged in a serious physical altercation with inmate Murillo. He was physically grappling with inmate Murillo throughout this. He had his arms wrapped around inmate Murillo and his head buried in his stomach. In prison for order, when the siren goes on, do inmates have a right to continue fighting? Or what is their... Certainly not in order. I mean, this is not like it happened on the outside, okay? There are rules in prison, and everyone knows what they are. So what happens? Your Honor, inmates are, all inmates, as Mr. Simmons testified, know that they are to get down, to lay prone on the ground, to sit down on the ground, to stop moving. And that's on Excerpts of Record, page 55. And so the alarm was sounded. They did not get down. They continued to fight after the first two sponge rounds were discharged. After the third round was discharged, the alarm was going off. They finally got down. And that's when force ceased. When there was no more need for force, force ceased. And that does not rise to the level of an Eighth Amendment violation. To briefly touch on the deliberate indifference claim. Let's just say, hypothetically, we disagree with you, that maybe we can't say, for summary judgment purposes, whether on the first prong there was a violation or not. Explain how we deal with these facts and address qualified immunity. Well, Your Honor, I think Mark Head is instructive on that and instructs that we look to what a reasonable official in that position could believe, whether or not they could plausibly believe that force was necessary in those circumstances. And is that taking Mr. Simmons' account of things exclusively? Yes, Your Honor. But here Mr. Simmons' account of things is that he was physically engaged with inmate Murillo, unlike in Whitley or in Marquez where the inmate says, I was trying to help or that I wasn't doing anything at all.  Your Honor, I think Judge Arderton asked, if I heard right, taking Simmons' account exclusively. Is that really, I think that's what she asked, and you said yes, but is that really what, that's kind of important, I think, because in Marquez, Marquez doesn't seem to have qualified, and the Eighth Amendment seems to take the inmate's account exclusively. But it's kind of odd, I'm not sure I understand what's going on in Marquez, because inmate gets the qualified immunity, all of a sudden it's like a whole different analysis, which does obviously take into account the officer's viewpoint, the officer's testimony, which was where they had to have gotten the officer's viewpoint from. So is it true, I mean, do you want, is it true that you're taking into account for qualified immunity purposes only Simmons' testimony, or are you some, or qualified immunity, do we somehow kind of look at the whole picture, including what could have been the officer's vantage point or perspective? The latter, Your Honor. Assuming the facts, as Mr. Simmons describes them, the facts as they occurred, but what a reasonable officer in Officer Arnett's position could plausibly, if seeing those facts, if that officer could plausibly believe that force was necessary. And there is no case that would instruct Officer Arnett that his conduct, responding to this very urgent situation, violated Mr. Simmons' Eighth Amendment rights. To the deliberate indifference issue, I want to correct two points on the record. First, the form that Nurse Lopez completed is not used as part of medical care. It is not part of the inmate's medical records, and it is not transmitted with the inmate as established and pointed out in our brief. Colin points to ER 130, but if the court reads that, that page does not stand for that proposition. But more significantly, it cannot as a matter of law be that Nurse Lopez triaging Mr. Simmons, seeing what she describes to be as a visibly broken bone, and immediately sending him for emergency medical treatment is deliberate indifference. Within 15 minutes of Nurse Lopez examining him, he was receiving morphine, he was examined by another nurse and another doctor, his leg was set, and he was transferred to an outside hospital. And the record further demonstrates that Mr. Lopez, or excuse me, Mr. Simmons, repeatedly told medical professionals he had no other injuries, as indicated on supplemental excerpts of the record 194 to 195, 8 and 9, 33, 39, and 41. In fact, Mr. Simmons testified at SER 194 to 195 that he didn't tell anyone about any other injuries, because his leg was the most pressing issue. So thank you, Your Honors, this court is adjourned. Thank you. All right, so even though we went over time with both of you, I'll give you, Mr. Wilson, two minutes and Mr. Wodracha, one minute. Thank you, Your Honors. So there's a reason why appellees don't mention the circumstances which occurred before inmate Murillo's fight, before inmate Murillo's attack, and that's because that's direct evidence of Barnett's state of mind. And as to what appellees mentioned in regards to grappling and having hands near Mr. Simmons's face, that conduct is completely consistent with self-defense, as well as the fact that Mr. Simmons had no reason to get on the ground. It could be, but it also could be consistent with, I mean, you agree that it could be consistent with being aggressive, too, right? I mean, that's the challenge. In other words, it's not enough that it would be consistent with your client's story. It also, in order to actually create a disputed issue of material fact, it actually has to be inconsistent with, you need to have facts that are inconsistent with the other story. And your best argument is probably the stuff that happened beforehand, but the hands being up by somebody could be the defense or it could be being aggressive. Would you agree with that? Yeah, yes, I would agree with that, Your Honor. But, again, at this point, at summary judgment, this is an inference that can and should be made in favor of Mr. Simmons. Well, I know it's actually important because the whole argument seems to be that if Mr. Simmons is right, I mean, it seems to be baked into your briefing as such, that if Mr. Simmons, if we believe Mr. Simmons, that that is necessarily a conflict with the officer. But I don't know, hopefully you can tell I'm struggling with that because it could be that both are right. It could very well be that both were true. And so it seems to me to actually create a disputed issue of material fact, you have to have something that's actually inconsistent with the officer having perceived this as something that under your story didn't happen. And that's the struggle. So you're saying, well, the officer should have been primed by what happened beforehand. I hear your argument on that. What else do you have that shows that even if Mr. Simmons is telling the truth here, and we'll assume that, that the officer had to have perceived this as a one-sided conflict? Your Honor, it is true that Mr. Simmons could have been the victim of an attack and Arnett could have thought that this was mutual combat. But in addition to that. What is a prison officer supposed to do, whether it's mutual, whether it's one person that started it or not? They can't let it go on. Because the prison guard also has a responsibility to have to restore discipline and make sure no one hurts each other. And I think, if I'm not mistaken, I think you can't even have mutual, I think they discipline people for mutual combat in prison. You just can't fight because they've got to protect you from each other, from, you know, all of that. So it's, I'm struggling with the fact that I don't know if the officer had not done anything, then Mr. Simmons would come back and say, well, he was deliberately indifferent for letting this go on. Well, Your Honor. You know, I'm trying to figure out if you're darned if you do and darned if you don't. But isn't that, doesn't that take us over to the qualified immunity argument, and that is what a reasonable officer would have perceived, not Arnett himself, whatever his thinking was. But it seems, even taking Mr. Simmons' view of things, they are locked together. And it is a combat, whether Mr. Simmons is an aggressor or not, or a victim or not, they are locked together for a reasonable official, not Arnett, not Officer Arnett. Wouldn't that, would that entitle a reasonable officer to say, well, you've got to bring order to this mess. You is what you've got. And that, therefore, with that analysis, Arnett gets qualified immunity. What's wrong with that line of reasoning? Your Honor, I would submit that Arnett, in his deposition, acknowledges that it never makes sense to shoot the victim of an attack. And in that situation, even if we do assume that hands were up and that blows were being thrown, if not landing, in light of the inference that Arnett knew what was going on based on what happened earlier, to shoot the victim of an attack only makes it so that the attack is more likely to continue. So that logically cannot amount to a good faith effort to restore order. If you do have that inference, then shooting the person that is being beaten with hands around the assailant, it only makes it more dangerous for both inmates, in particular the inmate that is being attacked. Is it undisputed that there was no clear shot to the other person? Your back, your client's back was to the officer. Is that undisputed? It's undisputed that there was no zone one shot at Mr. Simmons, correct. Okay. Thank you. At Simmons or Murillo? Oh, sorry, sorry, yes, at inmate Murillo. Okay, sorry. Okay. Thank you. Thank you. You're honest. I want to point out that in Gibson v. County of Washoe, this court stated that failure to medically screen could be deliberate indifference. And though the 1719 form was not part of the medical record, it was still called a medical report of injury. And Mr. Simmons testified that he did see a medical professional treating him with that form after Nurse Lopez treated him. And so I just wanted to make that point. So, I mean, it's got to be true, right? Failure to medically screen, you know, somebody walks in and the nurse is like, oh, I don't like you. And so it doesn't medically screen them because they are deliberately being indifferent to their needs because they hate them or something. And then that would obviously mean it. So I can see why. I think, as you can tell, what we're struggling with is just the circumstances here, everything that happened, including the obstruction of stuff and all that happened at the beginning. And in being such a short period of time and acting quickly, once it was discovered there was, if I remember right, a broken leg with the bone sticking out, how any of that would seem to be consistent with deliberate indifference. That's what we're struggling with. This is nothing we don't think that you could. Is that a conclusion to different cases, the facts of this case? Yes, I think there is an issue of fact as to a state of mind of Nurse Lopez because Mr. Simmons did tell her that he was shot on his backside. She ignored that. She did not put that on his form. She then proceeded not to examine him due to a complete head-to-toe examination, as she was required to put a form, and she marked off areas of the body as if she did examine those areas and marked it off as if there were no injuries as to his body except for the leg pain. Well, I think we have your argument in mind, and you're over time. So I'm going to conclude argument on this. Thank you, everyone, for your argument in this matter. It was very helpful. And we're, as I said earlier, as students now, you've argued before the Ninth Circuit, so keep swimming with the big fish here. And thank you for the pro bono work. We appreciate that as well. Obviously, Mr. Simmons wouldn't be able to come and make this argument here himself, so we appreciate you doing that. This matter will be submitted as of this date.
judges: CALLAHAN, VANDYKE, Arterton